UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**STEPHEN G. GREEN,**
    Debtor

Chapter 7
Case No. 05-11461-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**STEPHEN G. GREEN,**
    Plaintiff
v.
**CORNELL UNIVERSITY, SALLIE MAE
SERVICING CORPORATION, GITEAU
EDUCATIONAL LOAN, PERKINS
EDUCATIONAL LOAN, and
EDUCATIONAL CREDIT MANAGEMENT
CORPORATION,**
    Defendants

Adv. P. No. 05-1381

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

**I. INTRODUCTION**

    The matter before the Court is the Complaint for Declaratory Relief filed by Stephen Green (the "Debtor"), pursuant to which he seeks a determination that debt arising from various educational loans should be discharged under 11 U.S.C. § 523(a)(8) because repayment would impose an undue hardship upon him. Several defendants, including Educational Credit Management Corporation, Cornell University and Sallie Mae Servicing

1

Corporation disagree that discharge of the student loans they made is appropriate in the Debtor's case.[1]

The Court conducted a trial on May 23, 2006 at which the Debtor testified and 46 exhibits were submitted in evidence. Following the trial, the parties filed briefs. The issue presented is straightforward, although its resolution is not. Did the Debtor satisfy his burden of establishing that excepting his student loan obligations from discharge would impose an undue hardship upon him?

The Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

## II. FACTS

The Debtor filed a voluntary Chapter 7 petition on March 3, 2005. At present, he is 61 years old, in reasonably good health, with no dependents. Although he did not have health insurance at the time he filed his petition, he now has health care coverage through the Veterans Administration. The Debtor is extremely well educated, intelligent and articulate. Despite his best efforts, however, he has been unable to obtain satisfactory employment in his chosen field.

On his petition and in his Schedules and testimony, the Debtor disclosed that he resides in Newburyport, Massachusetts in a rental apartment which he shares with his girlfriend who has significant health issues. He and his girlfriend also share living

---

[1] One defendant, Wells Fargo Education Financial Services defaulted. According to the Debtor it held a claim in the approximate amount of $1,453.66.

2

expenses. At trial, the Debtor submitted an amended Schedule J-Current Expenditures of Individual Debtor(s) which shows that he has total monthly expenses of $1,730 and does not enjoy a lavish life style. The Debtor has no non-exempt assets.[2]

On his Schedules of liabilities, the Debtor disclosed an unsecured priority tax obligation in the sum of $1,351.14 and unsecured nonpriority claims totaling $212,588.38 comprised mainly of student loan debt and credit card debt. On June 30, 2005, the Debtor received a discharge of all his dischargeable debts.

The parties agree that the Debtor incurred student loan debt when he attended Cornell University to pursue undergraduate and graduate degrees. The Debtor is liable to Educational Credit Management Corporation ("ECMC"), which holds a federal consolidation educational loan, in the amount of $76,180.39 as of May 19, 2006. The interest rate on the loan is fixed at 6.625%, with a per diem charge of $13.08. The Debtor is liable to Sallie Mae Servicing Corporation ("Sallie Mae"), which holds one educational loan, in the sum of $9,919.88 as of November 18, 2005. The Sallie Mae loan has an interest rate of 7.25% with a per diem charge of $1.92. Cornell University also holds 13 loans, in the total principal amount of $13,860.65. Its loans including so-called Perkins educational loans and Giteau educational loans.

The Debtor has an impressive resume. At 48 years old, he elected to pursue

---

[2] The Debtor owns a 2001 Mazda Protege ES, which he valued at $6,140. At the time he filed his bankruptcy petition, the automobile was subject to a secured claim in the sum of $1,283.14. The Debtor testified that he has completed payments and owns the automobile outright. The Chapter 7 Trustee did not object to the Debtor's claimed exemption in the automobile or attempt to sell the automobile.

3

undergraduate and graduate degrees from Cornell University. Specifically, in 1997, he obtained a Bachelor of Science degree and, two years later, a Masters Degree in Healthcare Administration.

Prior to attending Cornell University, the Debtor was the president and operating officer of Green's Optical in Bakersfield, California. He operated that business between 1974 and 1994 without interruption except for a short period in 1989 when he served as the Director of Technical Services for Golden State Eye Medical in Bakersfield, California. As president and operating officer of Green' Optical, the Debtor planned, constructed, and managed a succession of retail optical stores, leveraging his original investment of $25,000 into a business with $600,000 in annual sales and $125,000 in net revenue. At the time, he was board certified by the American Board of Opticianry, earned a reputation as a preeminent regional optical service provider, was honored by the California Society of Ophthalmic Dispensers, and was a fellow of the National Academy of Opticianry.

After receiving his undergraduate degree from Cornell University, the Debtor sought entrance into the University's MBA program. During an interview with the dean of the business school, however, he was informed that he would not be admitted because of his age. As an alternative, the Debtor pursued a Masters in Healthcare Administration from the Sloan School at Cornell University, in part because he could take courses in the business school.

Ten months after obtaining his master's degree, the Debtor obtained employment at the Dartmouth-Hitchcock Medical Center, a large hospital, in Lebanon, New Hampshire,

with a starting salary of approximately $60,000. The Debtor testified that he was surprised that it took him so long to obtain employment and that it was necessary for him to send approximately 200 resumes to various prospective employers before he obtained the position. He stated: "The overarching feedback I got was that although I had a business background and I had built businesses, I had no practical administrative oversight or umbrella oversight of any health care operations program, and, therefore, I . . . had essentially zero experience. . . ."

The Debtor was employed at Dartmouth-Hitchcock Medical Center for approximately three years. While there, he was very successful and, indeed, took responsibility for converting a $1.25 million loss into a $600,000 profit for the hospital within 18 months. The Debtor left Dartmouth-Hitchcock in June of 2003 to take a position with Vermont Ophthalmology Associates which paid $15,000 more per year. He testified about his reasons for leaving Dartmouth-Hitchcock. He stated: "there was really nowhere to go from a professional standpoint, and the annual raises were really a small percentage of salary, and there was no pay for performance incentives or any kind of, you know, significant job recognition for superior performance." He added: "I had to look around for something that could help me, because I still had a tremendous debt load between credit cards and my educational debt that I was trying to service."

Within days of beginning work at Vermont Ophthalmology Associates, the Debtor discovered on-going insurance fraud there. He reported the physician who was performing unnecessary surgeries to the Vermont Medical Board, and the professional

5

association for which he had left Dartmouth-Hitchcock was closed. The Debtor's actions resulted in criminal charges against the physician in charge, as well as malpractice claims by patients. The Debtor stated that he spent several months testifying in various proceedings but did not seek compensation under any whistleblower statutes because of the adverse effects such a move might have on his employment prospects.

At present, the Debtor works intermittently as a consultant to healthcare operations and is committed to a nationwide job search in the healthcare field. Between January and August of 2005 he submitted 78 job applications to various organizations, and his efforts are continuing. He testified that he is hopeful about obtaining a suitable position. Indeed, he has been a serious contender for several postions.

At the commencement of his bankruptcy case, the Debtor was employed on a part-time basis at LensCrafters earning $14 per hour plus commissions. As a part-time employee, he was not eligible for any benefits. The Debtor testified that, although he was the number one salesperson at the North Shore Mall location where he worked, he found it very difficult to satisfy the company's requirement that salespeople follow a scripted routine when greeting customers. As a result he resigned his part-time position and collected unemployment benefits for approximately six months. He is now unemployed.

The Debtor testified that he made payments to student loan creditors for as long as he could. Indeed, he indicated that he made payments totaling $54,397, allocating approximately one-third of his disposable income to their repayment.

The Debtor also testified that he reviewed information relative to the William D.

Ford Federal Direct Loan Program and concluded that "none of the four options would work for me." He indicated that he authorized his attorney to respond to ECMC about the options available under the Ford program. According to the Debtor's attorney, the standard plan would require payments of $845 per month for 10 years, an amount the Debtor determined would not be feasible in view of his current circumstances. The extended plan would require payments over the next thirty years "or for approximately 15 years beyond the life expectancy of a U.S. white male. . . ." Under the graduated plan, the Debtor would have to increase monthly payments every two years at exactly the time he would be seeking additional financial relief due to retirement. Under that plan, according the Debtor's attorney, the Debtor would be paying $507 per month at age 76 and $581 per month at age 88 until the new note was finally paid when the Debtor would be 90 years old. With respect to the income contingent repayment plan, the Debtor, through his counsel, stated:

> In this case, another term for this loan is "Negative Amortization". That is, since he has been unsuccessful in obtaining work and he is close to retirement age, it is suggested that through this formula he would make no monthly payment, or, at most, a very small one, each year and be reevaluated annually as to ability to pay. This is problematic in that the 6.625% interest continues to accrue daily on the loan (approximately $74,000) for 30 years. If compounded annually with no offsetting payments (a conservative method), the outstanding balance would be over $418,240 at the end of 30 years. Then, according to the program, the remaining (essentially the entire) balance would be forgiven and this amount would be taxed as ordinary income.
>
> This presents three issues: 1) it seems unlikely that he could pay taxes on $418,000 of income at age 91, if he did not have the capacity to reduce the loan in the first place; and the over-riding debt would dramatically skew his debt to income ratio for the balance of his life, so that obtaining any

reasonable credit for any reason would be nil. [sic]

The Debtor reviewed his earning capacity in the absence of his ability to obtain employment. He stated that he would be able to receive Social Security benefits in the sum of $1,300 at age 62 and $1,700 at age 65. He also indicated that, although he currently shares expenses with his girlfriend, his situation might change because of her health problems, and that he might have to obtain an apartment of his own, thus increasing his monthly expenses. He also represented he is no longer a board certified optician, although he could obtain his accreditation again, that he lacks the capital to start a retail business, and that the market for optical services is dominated by a company known as Luxottica which is the parent company of both LensCrafters, and Pearle Vision.

## III. POSITION OF THE PARTIES

In support of his claim of undue hardship, the Debtor relies upon cases such as Durrani v. Educ. Credit Mgmt. Corp. (In re Durrani), 311 B.R. 496, 506-08 (Bankr. N.D. Ill. 2004), aff'd, 320 B.R. 357 (N.D. Ill. 2005), and Dufresne v. NH Higher Educ. Assistance Foundation (In re Dufresne), 341 B.R. 391 (Bankr. D. Mass. 2006),[3] for the proposition that the availability of the Ford Program's income contingent repayment plan is not dispositive as to whether a debtor can maintain a minimal standard of living while repaying student loans. He also relies upon these decisions which contain observations about the problem associated with debt forgiveness under the income contingent plan, namely the

---

[3] Judge Somma stated: "I employ the ordinary meaning of hardship as privation, a lack of basic life necessities or comforts, and undue hardship as a privation beyond reasonable limits." 341 B.R. at 395.

8

substitution of one nondischargeable debt for educational loans for another in the form of nondischargeable income taxes. For example, in Dufresne, Judge Somma noted "the indefinite and perhaps decades-long duration of that forbearance, the ongoing accruals of interest added to current debt, the public credit reporting of a large and growing debt in a perpetual default status, [and] the tax consequences of a debt forgiven many years hence. . . ." 341 B.R. at 395.

The student loan creditors counter that the Debtor failed to establish the existence of an *undue* hardship. They assert that he failed to establish that his future prospects for improvement of his income are so dim as to warrant discharge of his student loan debt, and they argue that his request for a discharge must be denied in view of his right to consolidate his debts under the William D. Ford Direct Repayment Loan Program. They rely upon, *inter alia*, Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour), 433 F.3d 393 (4th Cir. 2005), and Tirch v. Pennsylvania Higher Educ. Assistance Agency (In re Tirch), 409 F.3d 677 (6th Cir. 2005).

**IV. DISCUSSION**

A. Applicable Law

The United States Court of Appeals for the First Circuit discussed the evidence required to establish undue hardship in Nash v. Connecticut Student Foundation (In re Nash), 446 F.3d 188 (1st Cir. 2006). In that case, the First Circuit stated:

> Appellees would have us join the nine circuit courts of appeal that have followed the Second Circuit's test set forth in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395 (2d Cir. 1987) (per curiam). This is a tripartite test, requiring that the debtor show inability, at her current level of

9

income and expenses, to maintain a "minimal" standard of living; the likelihood that this inability will persist for a significant portion of the repayment period; and the existence of good faith efforts to repay the loans. Id. at 396.

A facially different test is the Eighth Circuit's totality-of-circumstances test, which would have courts consider the debtor's reasonably reliable future financial resources, his reasonably necessary living expenses, and "any other relevant facts." See Long v. Educ. Credit Mgmt. Corp. (In re Long), 322 F.3d 549, 554 (8th Cir. 2003). Appellant contends that this test does not include "good faith effort" under the "other relevant facts" rubric, although bankruptcy courts within the Eighth Circuit are not unanimous on this issue. She urges a "true totality of the circumstances test," focusing solely on the ability of the debtor to maintain a minimal standard of living now and in "the foreseeable future" and still afford to make loan repayments.

The bankruptcy judge, citing her opinion in Burkhead v. United States (In re Burkhead), 304 B.R. 560, 565 (Bankr. D. Mass. 2004), applied the totality approach but was of the view that courts essentially looked at the same factors under either test. She listed four relevant factors, including good faith efforts. The district judge noted the unadorned breadth of the statutory language, which he felt pointed to the totality test as "the default standard for all judging," and found that the care and methodical approach of the bankruptcy judge was "proper employment of a 'totality-of-the-circumstances' test, which is another way of saying it was proper judging." See 330 B.R. at 326-27.

We see no need in this case to pronounce our views of a preferred method of identifying a case of "undue hardship." The standards urged on us by the parties both require the debtor to demonstrate that her disability will prevent her from working for the foreseeable future. *Appellant has a formidable task, for Congress has made the judgment that the general purpose of the Bankruptcy Code to give honest debtors a fresh start does not automatically apply to student loan debtors. Rather, the interest in ensuring the continued viability of the student loan program takes precedence.* TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 937 (1st Cir.1995).

Nash, 446 F.3d at 190-91 (emphasis supplied).

In view of the First Circuit's decision in Nash, the factors set forth in Burkhead remain viable for determining whether repayment of the student loans would impose an

10

undue hardship. As this Court stated:

> Although not an exclusive list, the Court considers relevant, but not necessarily dispositive of the issue, the following:
> (1) whether the Debtor could meet necessary living expenses for herself if forced to repay the loans;
> (2) whether the Debtor has made good faith efforts to repay the loan;
> (3) whether the Debtor filed for bankruptcy for the sole reason of discharging student loan debt;
> (4) whether additional facts and circumstances such as a medical condition, employability and the like weigh in favor of a hardship discharge.

304 B.R. at 565 (citing Anelli v. Sallie Mae Serv. Corp. (In re Anelli), 262 B.R. 1, 8 (Bankr. D. Mass. 2000). In Burkhead, this Court acknowledged that "the First Circuit has suggested, though in dictum, that the 'hardship alleged . . . must be undue and attributable to truly exceptional circumstances, such as illness or the existence of an unusually large number of dependents.'" 304 B.R. at 565 (citing TI Federal Credit Union v. DelBonis, 72 F.3d 921, 927 (1st Cir.1995)).

B. Analysis

The Court finds that, while the Debtor has presented substantial evidence of his lack of income and present inability to repay his student loans, as well as his unsuccessful attempts to find employment in his chosen field, he has nevertheless failed to satisfy the stringent burden under 11 U.S.C. § 523(a)(8). The Debtor is not disabled and, while his age appears to be a handicap in his job search, he has not demonstrated that he will remain unemployed for the foreseeable future and unable to repay his student loan debt, at least in part through the income contingent repayment plan offered by the William D. Ford Direct Repayment Loan Program. Indeed, the Debtor has been a top contender for several

excellent health-care administrative positions.

While the Debtor has been diligent in searching for suitable employment, he voluntarily relinquished his position at LensCrafters and rejected all options under the William D. Ford Direct Repayment Loan Program. While the Debtor has made student loan payments in the past, his decision to forego employment because he disliked the job requirements suggests that he is not making good faith efforts to repay his loans now.

Were the Debtor not 61 years old, his prospects would be bright. His age and his standards for himself are the only hindrances in his job search. The Debtor is extremely well-educated and articulate. His resume reveals considerable entrepreneurial and business experience, as well as salesmanship. He clearly has the capacity to motivate others and is conscientious and responsible. Undoubtedly, if given an opportunity, he would be a valuable employee of any healthcare or business organization. In short, for this Court to find the student loans in question to be dischargeable, it would have to determine that the Debtor's job prospects are hopeless. Given his educational and work experience, as well as the discharge of approximately $100,000 of credit card debt and the Wells Fargo student loan debt, the Debtor's position is not hopeless. He has his health and no dependents. He now has health care coverage through the Veteran's Administration. Although his circumstances are by no means enviable, and it will be a hardship for him to repay the student loans in question, he has failed to prove that repayment will constitute an *undue* hardship. As the First Circuit observed in <u>Nash</u>, Congress has granted precedence to the continued viability of the student loan program over the fresh start

12

afforded by the discharge of student loans. 446 F.3d at 191. The Debtor's fresh start must yield to that Congressional mandate.

## V. CONCLUSION

In view of the foregoing, the Court shall enter a judgment in favor of the Defendants and against the Plaintiff.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: July 24, 2006
cc: John F. White, Esq., Joshua Pemstein, Esq., Robert Smith, Esq., Gary W. Cruickshank, Esq.

13